Elodie JOCHUM, Wife of/and Carmelo F. Pagano, Plaintiffs-Appellants,

v.

PICO CREDIT CORPORATION OF WESTBANK, INC., Defendant-Appellee.

No. 83–3448.

United States Court of Appeals, Fifth Circuit.

April 30, 1984.

**1042**

Garon, Brener & McNeely, John F. Robbert, New Orleans, La., for plaintiffs-appellants.

Irl R. Silverstein, Gretna, La., for Pico.

Before TATE, JOLLY and DAVIS, Circuit Judges.

TATE, Circuit Judge:

The plaintiffs, applicants denied credit by the defendant, bring suit for damages allegedly caused them by the defendant's violation of a provision of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.* ("the Act"). Jurisdiction is based upon 28 U.S.C. § 1337(a) and 15 U.S.C. § 1691e. The plaintiffs, Elodie Jochum and her husband, Carmelo Pagano, now appeal from the district court's entry of a summary judgment in favor of the defendant, Pico Credit Corporation of the Westbank ("Pico"), dismissing their suit.

The Act requires, with an exception not here claimed to be applicable,[1] that a creditor must notify an applicant for credit of "adverse action" taken against his application and, in so doing, must give a written statement of the specific reasons therefor. 15 U.S.C. § 1691(d)(1), (2), and (3) ("Section 1691(d)"). In dismissing the plaintiffs' claim, the district court (without assigning reasons) apparently accepted the defendant Pico's argument that the refusal of a creditor to fund a pending loan application, upon its discovery of undisclosed priming judicial mortgages, is not an "adverse action" under the Act that requires written notification of the reasons for refusing to extend the requested credit.

We reverse, finding that a denial of credit is statutorily defined to be "adverse action," 15 U.S.C. § 1691(d)(6), and that under the showing made the creditor's refusal to fund the loan application was a denial of credit and an "adverse action" within the meaning of the Act, *id.*, and of the administrative regulations, 12 C.F.R. §§ 202.1 *et seq., see* § 202.2(c), prescribed by the Board of Governors of the Federal Reserve System, pursuant to authority legislatively conferred by the Act, 15 U.S.C. § 1691b(a).

Before adverting to the facts and particular issues of this appeal, we discuss the statutory context in which they arise.

*Statutory Context*

Section 1691(d), requiring a creditor to give written notice of adverse action on a

---

**1.** Section 1691(d)(5) of the Act exempts small creditors, i.e., those who did not act upon more than 150 credit applications in the preceding calendar year, from the requirement of *written* notice of the specific reasons for the adverse action. These creditors may satisfy the notification requirement by "verbal statements or notifications" of the specific reasons for adverse action. 15 U.S.C. § 1691(d)(5).

credit application, was added by a 1976 amendment, Pub.L. 94–239, as one of the broadening amendments to the Act as originally enacted in 1974, Pub.L. 93–495, Title V, § 503, 88 Stat. 1525. Section 1691(d), as thereby adopted, provides:

(1) Within thirty days (or such longer reasonable time as specified in regulations of the [Federal Reserve] Board for any class of credit transaction) after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application.

(2) Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies this obligation by—

(A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or

(B) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

(3) A statement of reasons meets the requirements of this section only if it contains the specific reasons for the adverse action taken.

\* \* \* \* \* \*

The Senate Report explained the purpose of these new notification requirements:

The requirement that creditors give reasons for adverse action is, in the Committee's view, a strong and necessary adjunct to the anti-discrimination purpose of the legislation, for only if creditors know they must explain their decisions will they effectively be discouraged from discriminatory practices. Yet this requirement fulfills a broader need: rejected credit applicants will now be able to learn where and how their credit status is deficient and this information should have a pervasive and valuable educational benefit. Instead of being told only that they do not meet a particular creditor's standards, consumers particularly should benefit from knowing, for example, that the reason for the denial is their short residence in the area, or their recent change of employment, or their already over-extended financial situation. In those cases where the creditor may have acted on misinformation or inadequate information, the statement of reasons gives the applicant a chance to rectify the mistake.

Senate Report No. 589, 94th Cong., reprinted in 1976 U.S.Code Cong. & Admin. News 403, 406.[2]

The plaintiffs bring this action pursuant to Section 1691e of the Act, which affords a cause of action against any creditor "who fails to comply with any requirement" imposed by the Act. 15 U.S.C. § 1691e. The defendant does not question that an aggrieved credit applicant may bring an action under the Act against a creditor who fails to provide a written statement of reasons for adverse action taken against that applicant,[3] but rather contends that the

---

**2.** The proposed Senate Bill required the creditor's statement of reasons to give a "concise indication" of the reasons for adverse action. Senate Report No. 589, 94th Cong., reprinted in 1976 U.S.Code Cong. & Admin.News 403, 410. While the House version of the Bill contained no similar provision, the conference report shows that the Senate position was adopted, though the particular language was altered to require a statement of the "specific reasons for the adverse action taken." (Emphasis added.) House Conference Report No. 873, 94th Cong.,

reprinted in 1976 U.S.Code Cong. and Admin. News 427, 428. Nothing in the legislative history suggests that Congress intended this modification in the language of the notification requirement to either limit or expand the rights of credit applicants under § 1691(d). We may, therefore, look to the Senate Report for an explanation of the purposes of this legislation.

**3.** The plaintiffs have not alleged any discrimination prohibited by § 1691(a) of the Act, i.e., discrimination in a credit transaction based on

facts as alleged by the plaintiffs do not establish that "adverse action", as defined by the Act and its implementing regulations, was taken by Pico on the plaintiffs' application for a loan. For the reasons stated below, we disagree.

*Context Facts*

Viewing the facts shown in the depositions and admissions most favorable to the party opposing the motion for summary judgment, as required, *see, e.g., Walters v. City of Ocean Springs*, 626 F.2d 1317, 1322 (5th Cir.1980), they show, for present summary-judgment purposes:

The plaintiffs contracted with a home improvement firm ("Oak Home") to make certain improvements on their home, provided that credit could be obtained. Oak Home referred them to the defendant Pico for financing. On August 10, 1981, the plaintiffs completed their credit application at Pico and executed a second mortgage, the latter not to become effective unless the loan was approved. Included in the documents executed by the plaintiffs was a "consummation of loan" agreement, by which the loan was made contingent upon the plaintiffs' ability to grant Pico a "valid" second mortgage on their home.

Oak Home informed the plaintiffs that their loan was approved, whereupon Oak Home commenced and completed the contracted-for work between August 12 and 14. In the meantime, Pico discovered three recorded judgments (totaling about $6,000) against the plaintiffs, which under Louisiana law are judicial mortgages affecting immovable (real) property of the judgment debtor. On August 17, after the work was done, the plaintiffs were informed by Oak Home that their credit had not been approved and that they must make immediate payment for the work done. The plaintiffs

claim that this is the first they knew that Pico had disapproved their loan application, and their depositions deny that Pico ever informed them of the reasons for the denial of credit to them.

Pico's factual showings are to the effect that the plaintiffs were informed by telephone of the reasons for the refusal to complete the loan. However, Pico's factual showing seems to admit that it never furnished the plaintiffs any written statement of the specific reasons for nonconsummation of the loan.

*"Adverse Action" Against an Applicant for Credit*

The Equal Credit Opportunity Act requires a creditor to notify a credit applicant of the specific reasons for its action when it takes "adverse action" against the applicant's request for credit. Section 1691(d)(1), (2), (3), quoted *supra.* Section 1691(d)(6) defines "adverse action" as follows:

> For purposes of this subsection [§ 1691(d) ], the term "adverse action" means a *denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested.* Such term does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit. [Emphasis added.]

In addition, as authorized by 15 U.S.C. § 1691b(a) of the Act, the Federal Reserve Board has prescribed regulations in aid of the statutory purposes. One of them, 12 C.F.R. § 202.2(c),[4] defines "adverse ac-

sex, marital status, race, color, religion, national origin, receipt of public assistance benefits, or the exercise of rights under the Consumer Credit Act. Nevertheless, they have stated a cognizable claim under the Act should they prove, as alleged, that Pico as a creditor failed to comply with the separate and independent notification requirements of § 1691(d). *See Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 145–47 (5th Cir.1983).

4. "Adverse action" is further defined by the Federal Reserve Board's regulations under the Act as follows:
> *Adverse action.* (1) For the purposes of notification of action taken, statement of rea-

tion"; it also specifically notes creditor actions with regard to an applicant that are *not* included within that term.

Pico claims that it did not violate the Act by failing to give notice to the plaintiffs of nonconsummation of their loan because its conduct falls within the administrative exclusions from the definition of "adverse action" provided by (1) 12 C.F.R. § 202.-2(c)(2)(i) or by (2) 12 C.F.R. § 202.2(c)(2)(iii), and (3) it further contends that the plaintiffs' suit under the Act is precluded by 12 C.F.R. § 202.6(c) as authorized by state law.

We address each of these arguments below.

### (1) *Applicants' Expressly Agreed to a Condition That Was Not Met*

■ The defendant Pico relies upon 12 C.F.R. § 202.2(c)(2)(i), which states:

The term [adverse action] does not include:

(i) A change in the terms of an account expressly agreed to by an applicant;

. . . . .

12 C.F.R. § 202.2(c)(2)(i). Pico contends that the plaintiffs expressly agreed to a condition in their loan agreement stating

that their loan would be contingent upon their ability to grant Pico a "valid" second mortgage on their home. Since the three previously-filed judicial mortgages would prime any second mortgage, Pico reasons that an agreed-upon condition of the loan was not fulfilled, and thus the change in the account (the denial of the loan) was expressly agreed to by the applicant. Hence, the defendant argues, no "adverse action" was taken.

The defendant's argument on this ground cannot withstand scrutiny. The word "account" is defined by the Board's regulations as "an extension of credit." 12 C.F.R. § 202.2(a). Under the undisputed facts, Pico refused to grant the plaintiffs' application for a loan. It did *not* extend "credit" to them. Since no "account" was established between the parties, no change in an "account" could occur to which the plaintiffs could agree.[5] (The plaintiffs, through their loan application, were seeking to establish an "account" with Pico.)

### (2) *Refusal to Authorize an Account Transaction at the Point of Sale or Loan*

■ The defendant next contends that its refusal to approve the plaintiffs' loan

---

sons for denial, and record retention, the term means:

(i) A refusal to grant credit in substantially the amount or on substantially the terms requested by an applicant unless the creditor offers to grant credit other than in substantially the amount or on substantially the terms requested by the applicant and the applicant uses or expressly accepts the credit offered; or

(ii) A termination of an account or an unfavorable change in the terms of an account that does not affect all or a substantial portion of a classification of a creditor's accounts; or

(iii) A refusal to increase the amount of credit available to an applicant when the applicant requests an increase in accordance with procedures established by the creditor for the type of credit involved.

(2) The term does not include:

(i) A change in the terms of an account expressly agreed to by an applicant; or

(ii) Any action or forbearance relating to an account taken in connection with inactivity, default, or delinquency as to that account; or

(iii) A refusal or failure to authorize an account transaction at a point of sale or loan, except when the refusal is a termination or an unfavorable change in the terms of an account that does not affect all or a substantial portion of a classification of the creditor's accounts or when the refusal is a denial of an application to increase the amount of credit available under the account; or

(iv) A refusal to extend credit because applicable law prohibits the creditor from extending the credit requested; or

(v) A refusal to extend credit because the creditor does not offer the type of credit or credit plan requested.

(3) An action that falls within the definition of both paragraphs (c)(1) and (c)(2) of this section shall be governed by the provisions of paragraph (c)(2) of this section.

12 C.F.R. § 202.2(c).

**5.** See 12 C.F.R. § 202.2(a) ("Definitions and Rules of Construction"):

*Account* means an extension of credit. When employed in relation to an account, the word *use* refers only to open end credit.

application fell within a second administratively-defined exclusion from an "adverse action" by the creditor:

> A refusal or failure to authorize an *account transaction at a point of sale or loan,* except when the refusal is a termination or an unfavorable change in the terms of an account that does not affect all or a substantial portion of a classification of the creditor's accounts or when the refusal is a denial of an application to increase the amount of credit available under the account. [Emphasis added.]

12 C.F.R. § 202.2(c)(2)(iii). Pico claims that since it denied the plaintiffs' credit "at a point of loan," its action does not constitute an adverse action by the express language of the regulations.

To fall under the exclusion, the credit relationship between Pico and the plaintiffs must be characterized as an "account transaction." As noted in (1) above, the relationship between the two parties had not ripened into an "account" [*i.e.,* an "extension of credit"] by the regulatory definition, 12 C.F.R. § 202.2(a), and, for reasons to be stated, we find that "an account transaction" refers to an action between the creditor and the debtor *after* an "account" has been established between the two. Read in this manner, this regulation refers only to transactions that later occur in an established credit account and exempts from "adverse action" an isolated refusal to authorize a transaction on such an account, as opposed to a refusal to establish a credit account altogether. Since Pico did not extend credit to the plaintiffs, the denial of their loan application cannot be construed as a refusal to authorize some *further* account transaction at the point of loan.

We reach this meaning of "account transaction" (a) on the basis of statutory and regulatory history applicable to this administrative regulation, and (b) because a broader meaning of the term "account transaction" would flout the legislative intent and undermine the statutory purposes.

*As to (a):*

The current C.F.R. § 202.2(c)(2)(iii) was prescribed in 1978, replacing and elaborating on an earlier version of this regulation. The type of credit relationship contemplated as excluded from "adverse action" by this regulation is more clearly delineated by the earlier version, *see* 12 C.F.R. § 202.-2(c)(2)(iii):

> A refusal to extend credit at a point of sale or loan *in connection with the use of an account* because the credit requested would exceed a previously established credit limit on the account. [Emphasis added.]

As initially prescribed by the Board (not long after the 1976 statutory amendment to the Act), the regulation was designed to express a purpose reflected by the legislative history. While the refusal to approve an application for a credit card, or an increase in its limits, or its revocation, would be an "adverse action," 15 U.S.C. § 1691(d)(6), 12 C.F.R. § 202.2(c)(1), Congress did not intend, as impracticable, to require that written notice be required for every refusal to authorize credit for any single credit-card sale-transaction in the use of a credit card or other revolving credit relationship. As stated in the legislative history:

> Similarly, there is not adverse action taken within the meaning of this section when a credit card issuer refuses to authorize new credit under a revolving credit plan for a customer who seeks such credit in a point-of-sale transaction where that new credit would exceed the established limit for that customer. This would hold true even where a particular creditor would treat an attempted purchase as an implied request for an increased credit line. The formalized statement of reasons called for in this section is appropriate, in the Committee's view, only where there is an equally formalized application for credit, and not for inexplicit requests for increased limits on open end credit plans.

Senate Report No. 589, 94th Cong., *reprinted in* 1976 U.S.Code Cong. and Admin.News 403, 412.

The version of the regulation in effect prior to March 13, 1978, above-quoted, was designed to effectuate this legislative purpose by excluding from an "adverse action" the *"refusal to extend credit* at a point of sale or loan *in connection with the use* [6] *of an account."* (Emphasis added.) The elaboration of the provision reflected by the present version of the regulation in terms narrowed the exclusion,[7] but its substitution of *"refusal or failure to authorize an account transaction* at point of sale" (emphasis added) does not reflect, in our opinion, any intent to derogate from the previous meaning of the exclusion. Under its previous wording, written notice simply was not required of the specific reasons for any single refusal to permit a credit purchase in the course of a previously established "account" (*i.e.,* previously established extension of credit) relationship.[8]

*As to (b):*

To construe the term "account transaction" (as if ambiguous) as argued by Pico would, moreover, thwart the statutory purpose and be inconsistent with the express terms and legislative history of the Act. Section 1691(d)(6) expressly defines an adverse action, that requires written notice, as including "a denial or revocation of credit" and "a refusal to grant credit in substantially the amount ... requested." It would be most difficult, as a matter of law or of common sense, to characterize Pico's rejection of the plaintiffs' loan application as not included within these statutorily-assigned meanings of a creditor's "adverse action."

Although the plain language of an administrative regulation controls judicial construction of it, *Oliver v. United States Postal Service,* 696 F.2d 1129, 1131 (5th Cir.1983), a regulation should be interpreted in a manner that effectuates its central purposes, *Columbia Gas Development Corp. v. Federal Energy Regulatory Commission,* 651 F.2d 1146, 1151 (5th Cir.1981). The courts should not interpret an agency regulation to thwart the statutory mandate it was designed to implement. *Insurance Company of North America v. Gee,* 702 F.2d 411, 414 (2d Cir.1983).

Pico's argument ignores these interpretative principles. Pico argues that we should construe the term "account transaction" (as if it were ambiguous) so as to include any pre-"account" denial of credit at point of loan—that is, that no adverse action requiring notice occurs when a creditor denies an applicant's application at point of loan before an extension of credit (*i.e.,* "account") relationship has been created between the parties.

If § 202.2(c)(2)(iii) in its present form, as quoted above, is so read to except pre-account denials of loans and credit from the definition of "adverse action," creditors would be freed from the notification requirements of the Act whenever credit was denied at "a point of sale or loan." So construed, the regulation would exempt even the most standard denials of an application for a loan or credit, such as the one present here. This result is clearly contrary to the stated purpose of § 1691(d) of the Act, which expressed the intention that "adverse action" requiring notification of reasons should include "denials" and "revocations" of credit, as well as refusals to grant credit. The defendants' construction of § 202.2(c)(2)(iii) of the Federal Reserve Board's regulations would undermine the very purpose of the notification requirement of the Act.

---

**6.** *See* footnote 5, *supra.*

**7.** The additional language of the present version of § 202.2(c)(2)(iii) clarified that a refusal to allow credit at a point of sale in an account transaction would nevertheless be an "adverse action" when "the refusal is a termination or an unfavorable change in the terms of the account."

**8.** In each instance, the Board prescribed the initial and revised regulation within the Act's authority to it to "provide for such adjustments and exceptions to any class of transactions as ... are necessary or proper to effectuate the purpose of this [Act]." 15 U.S.C. § 1691b(a).

In summary, the present creditor's denial or refusal to extend credit is not excluded from the definition of "adverse action" under either the language or the intended purpose of that regulation.

### (3) *Application of State Property Laws*

██ Pico's third and final contention is that 12 C.F.R. § 202.6(c) expressly authorizes the action it took against the plaintiffs, and thus precludes the plaintiffs' suit under the Act. § 202.6(c) states:

> *State Property Laws.* A creditor's consideration or application of State property laws directly or indirectly affecting credit worthiness shall not constitute unlawful discrimination for the purposes of the Act or this part.

Pico argues that its decision to deny the loan was based entirely upon its inability to obtain a "valid" second mortgage—in Pico's estimation, a second mortgage that was primed only by the first mortgage—on the plaintiffs' home, and thus was merely "an application of State property laws" exempted from the Act.

This contention fails in its own premise. § 202.6(c) states that the application of state property laws will not constitute "unlawful discrimination." It does not provide any exception to the notification requirements of § 1691(d), and thus cannot excuse the creditor's failure to provide notice of the specific reasons for the denial of the plaintiffs' loan application.[9]

### *Conclusion*

For the reasons stated, we REVERSE the summary judgment as improvidently granted, since we find that under the disputed issues of material fact the defendant creditor Pico's conduct in refusing to consummate the loan for which the plaintiffs had applied was an "adverse action" for which the statute required written notice to the applicants of the specific reasons therefor. Costs to be paid by the defendant-appellee. We REMAND for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

9. Indeed, Pico could have complied with the notice and statement of reasons requirements of the Act simply by informing the applicants that there were "undisclosed prior judgments" or by using one of the check-list reasons (*e.g.,* "inade-quate collateral", "delinquent credit obligations"), illustratively stated in 12 C.F.R. § 202.-9(b)(2) (sample notice and statement of reasons for adverse action taken against a credit applicant).