Teresa T. DIAZ, and Timothy
J. Hall, Plaintiffs,

v.

VIRGINIA HOUSING DEVELOP-
MENT AUTHORITY, and Nation-
al City Mortgage Co., Defendants.

No. Civ.A. 00–637–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Oct. 12, 2000.

Barry Michael Parsons, Crowell & Moring, Washington, DC, for plaintiff.

Carl P. Bowmer, Christian & Barton, L.L.P., Richmond, VA, for Virginia Housing Development Authority.

Paul Warren Mengel, Vorys, Sater, Seymour & Pease, L.L.P., Alexandria, VA, for National City Mortgage Co.

## MEMORANDUM OPINION

ELLIS, District Judge.

Plaintiffs Teresa T. Diaz and Timothy J. Hall brought this action under the federal Equal Credit Opportunity Act ("ECOA" or "Act"), 15 U.S.C. §§ 1691 *et seq.*, and its Virginia counterpart ("VA ECOA"),[1] Va. Code § 59.1–21.21:1, when they were denied a home loan because of their status as an unmarried couple. Specifically, plaintiffs claim that defendants National City Mortgage ("NCM") and Virginia Housing Development Authority ("VHDA") violated ECOA by denying plaintiffs credit based on their unmarried status and by failing to provide plaintiffs with proper written notice of the credit denial. The claims asserting the unlawfulness of the credit denial against VHDA were dismissed on a threshold motion. *See Diaz v. Virginia Housing Auth.*, 101 F.Supp.2d 415 (E.D.Va.2000) ("*Diaz I* "). Thereafter, the parties stipulated to a dismissal of plaintiffs' claims for unlawful failure to provide notice of adverse action against VHDA. At

---

1. As VA ECOA's language mirrors that of the federal ECOA, the term "ECOA" is used here- in to refer to both statutes.

issue now on summary judgment[2] are the remaining claims concerning the statutory adequacy of NCM's notice of denial of credit and the unlawfulness of its credit denial.

## I.

The essential facts are not disputed. Plaintiffs Teresa Diaz and Timothy Hall are an unmarried couple who together sought to purchase a home in 1998. To that end, they applied for financing from NCM, a company that offers mortgage loans sponsored by both the Federal Housing Authority ("FHA") and VHDA. A loan originating officer at NCM recommended that plaintiffs apply for the VHDA "FHA Plus" loan program for low and moderate income Virginia residents in need of down payment assistance. Plaintiffs accordingly completed and submitted a VHDA loan application and attended a VHDA-sponsored home ownership education program required to qualify for the FHA Plus loan program. Plaintiffs then found a suitable home and entered into an agreement for the purchase of that home, with a closing date scheduled for late April 1998.

Approximately two days before the scheduled closing, the NCM loan officer called plaintiffs and informed them that they did not qualify for the loan because VHDA regulations require recipients of FHA Plus loans to be married. Plaintiffs were told, however, that they qualified for an alternative FHA loan that required a greater down payment than the FHA Plus loan. On or about April 28, 1998, plaintiffs accepted and executed the requisite documents for the alternative loan. Plaintiffs

were never provided with written notice of the denial of their FHA Plus application.[3]

In April of this year, plaintiffs filed suit against VHDA and NCM for unlawful denial of credit and for unlawful failure to provide notice of adverse action to each of them in violation of ECOA and VA ECOA, seeking compensatory and punitive damages, declaratory relief, and injunctive relief. *See* 15 U.S.C. § 1691e; Va.Code § 59.1–21.23. Specifically, the eight-count complaint included claims by each plaintiff against both NCM and VHDA for: (i) unlawful denial of credit in violation of federal ECOA (Counts I and II); (ii) unlawful failure to provide notice of adverse action in violation of federal ECOA (Counts III and IV); (iii) unlawful denial of credit in violation of VA ECOA (Counts V and VI); and (iv) unlawful failure to provide notice of adverse action in violation of VA ECOA (Counts VII and VIII).

VHDA previously moved to dismiss plaintiffs' unlawful denial of credit claims pursuant to Rule 12, Fed.R.Civ.P, which motion was granted. *See Diaz I.* For the same reasons, plaintiffs' unlawful denial of credit claims against NCM must fail. In addition, plaintiffs' unlawful denial of notice claims against VHDA have been dismissed by stipulation. *See Diaz v. Virginia Hous. Dev. Auth.*, No. 00–637–A (Oct. 4, 2000) (order granting plaintiffs' stipulated motion to dismiss with prejudice Counts III, IV, VII, and VIII against VHDA). Thus, all that remains in this matter are plaintiffs' claims against NCM for unlawful failure to provide written notice of adverse action under federal ECOA and VA ECOA. NCM has moved for sum-

---

**2.** Although NCM initially moved for a judgment on the pleadings, the motion was converted to one for summary judgment on NCM's oral motion.

**3.** The documentary record is unclear as to whether the Uniform Residential Loan Application ("Application") that plaintiffs filled out on February 21, 1998, was an application for *both* an "FHA Plus" loan *and* a "straight" FHA loan or simply an application for the former. This lack of clarity on the matter is

further compounded by the existence of a second Application, dated April 30, 1998, that plaintiffs claim they never saw, dated, or executed (although the April Application bears plaintiffs' signatures). At the hearing, NCM conceded that the February Application was limited to the "FHA Plus" loan, and that only after this application was denied were plaintiffs considered for the "straight" FHA loan. The analysis thus proceeds on this basis.

mary judgment on these remaining counts—Counts III, IV VII, and VII—solely against NCM.

## II.

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact" and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether there is a genuine issue of material fact, the evidence must be viewed in a light most favorable to the nonmoving party, and all inferences must be drawn in that party's favor. *See Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538; *Nguyen v. CNA Corp.,* 44 F.3d 234, 236–37 (4th Cir. 1995); *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985). Summary judgment is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Rule 56, Fed.R.Civ.P.; *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. These princi-

4. Initially, plaintiffs also argued that NCM failed to give plaintiffs *any* notice—whether written or otherwise—of its action on their "FHA Plus" loan application within thirty days after receiving a completed application, as required by ECOA. Plaintiffs abandoned this contention when discovery disclosed that their loan application was not completed until April 16, 1998, when they completed a mandatory educational program, and that less than two weeks later, on or about April 23, 1993, an NCM loan officer called plaintiffs to inform them that the FHA Plus application had been denied, but that they qualified instead for the "straight" FHA loan. In short, the parties dispute not the timeliness of notice, but only that it was provided orally rather than in writing.

ples govern whether the current factual record is suitable for summary judgment.

## III.

The parties' contentions as to notice are straightforward: Plaintiffs contend that NCM violated ECOA's notice requirement when it failed to provide plaintiffs with written notice that they were denied the VHDA "FHA Plus" loan on the basis of their unmarried status, and NCM counters by arguing that ECOA does not require written notice where, as here, an alternative loan is offered and accepted.[4] As there is no controlling circuit authority, analysis must begin with a consideration of the pertinent statutory provisions and end with the application of those provisions, as properly construed, to the facts presented.

 Notice is an integral part of the ECOA scheme to prevent discrimination "with respect to any aspect of a credit transaction." 15 U.S.C. § 1691(a); *accord* Va.Code § 59.1–21.21:1(a). To that end, ECOA and the implementing regulations mandate that a creditor "notify the applicant of its action on the application," within thirty days after receiving a completed credit application,[5] and provide that "[e]ach applicant against whom *adverse action* is taken" is entitled to written notification of both the action and "the specific reasons for the adverse action taken."[6]

5. 15 U.S.C. § 1691(d)(1); *accord* Va.Code § 59.1–21.21:1(d)(1); *see* 12 C.F.R. § 202.9(a)(1).

6. 15 U.S.C. §§ 1691(d)(2)–(3) (emphasis added); *accord* Va.Code § 59.1–21.21:1(d)(2)–(3); *see* 12 C.F.R. § 202.9(a)(2). A creditor may fulfill this requirement under ECOA by:
 (A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or
 (B) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such statement may be

This notice requirement serves as "a necessary adjunct to the anti-discrimination purpose of the legislation, for only if creditors know that they must explain their decisions will they effectively be discouraged from discriminatory practices." *Jochum v. Pico Credit Corp.*, 730 F.2d 1041, 1043 (5th Cir.1984) (quotation omitted).

■ Significantly, ECOA's written–notice requirement is triggered only in the event a creditor takes "adverse action" with respect to an application for credit. This follows from the fact that ECOA's plain language requires written notice for "adverse actions," but is otherwise silent as to other types of action—namely, "approval[s] of [and] counteroffer[s] to" applications for credit. 12 C.F.R. § 202.9(a)(1)(i). In these circumstances, it is well-settled under the doctrine of *expressio unius est exclusio alterius* that "[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974) (quotation omitted); *see also Bates v. United States*, 522 U.S. 23, 30, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quotation omitted). Therefore, whether ECOA required NCM to provide plaintiffs with written notice of NCM's action turns on whether NCM took "adverse action" on plaintiffs' application.

ECOA broadly defines "adverse action" to mean "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." [7] 15 U.S.C. § 1691(d)(6); *accord* Va.Code § 59.1–21.20(e). But this broad definition is not the end of the matter, for the implementing regulations of the Board of Governors of the Federal Reserve System (the "Board") refine and narrow the definition of "adverse action" by excluding from the set of such actions denials of credit that are coupled with counteroffers that are accepted. In the words of the regulation, an "adverse action" occurs when there is "[a] refusal to grant credit in substantially the amount or on substantially the terms requested in an application *unless* the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered." 12 C.F.R. § 202.2(c) (emphasis added). Moreover, these regulations recognize as distinct (i) "approval[s] of," (ii) "counteroffer[s] to," and (iii) "adverse action[s] on" loan applications. *Id.* § 202.9(a)(1)(i). It is clear, therefore, that the regulations exclude from the definition of "adverse action" any credit denials that are coupled with "counteroffers"—or a "grant [of] credit in a different amount or on other terms"—and, by logical extension, such denials coupled with counteroffers are also excluded from ECOA's written-notice requirements, where the applicant accepts the counteroffer. Accordingly, plaintiffs' argument that ECOA required written notice in this case because "counteroffers are, for all practical purposes, denials of credit under ECOA," and because "[d]enials of credit, in turn, are included within ECOA's definition of 'adverse action'" is unpersuasive.

given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

15 U.S.C. § 1691(d)(2); *see* 12 C.F.R. § 202.9(2).

7. Under this broad definition, NCM's action on plaintiffs' application for the FHA Plus loan was arguably "adverse," for it is undisputed both that NCM denied plaintiffs' "FHA Plus" loan and that the "straight" FHA loan plaintiffs ultimately accepted is not a grant of credit "in substantially the amount or on substantially the terms requested."

The Board's regulations, applied here, compel the conclusion that ECOA's written-notice requirement was never triggered because no "adverse action" occurred. Thus, there is no dispute that although NCM denied plaintiffs' application for the "VHA Plus" loan program, NCM, contemporaneously with oral notice of the denial, also offered plaintiffs a "straight" VHA loan that plaintiffs ultimately accepted. The "straight" VHA loan clearly was a counteroffer "to grant credit in a different amount or on other terms." And, having made this counteroffer in conjunction with its denial of plaintiffs' "VHA Plus" loan application, NCM was not required to notify plaintiffs in writing of the denial, because there was no "adverse action" under the regulations. *See Dorsey v. Citizens & South. Fin. Corp.*, 678 F.2d 137, 139 (11th Cir.1982) (per curiam) ("[T]he action of a creditor in rejecting a credit application ... when that rejection is coupled with a counteroffer that the applicant accepts .... is not adverse action and does not trigger the notification provision of section 701(d)(2)."), *withdrawn*, 687 F.2d 140, *reinstated* 706 F.2d 1203 (11th Cir.1983).

Seeking to avoid this result, plaintiffs present three arguments, none of which is persuasive. First, Plaintiffs argue that the Board's issuance of a sample adverse action notice form—denominated "Form C–4"—to be used where a creditor denies an application for credit and instead extends a counteroffer, indicates the Board's intent to require written adverse action notices for denials of credit coupled with counter-

offers. *See* 12 C.F.R. Pt. 202, App. C, Form C–4. Plaintiffs, however, misunderstand the purpose of Form C–4. Nowhere does the Board state that the form must be used for *all* denials coupled with counteroffers, or that all such actions are "adverse actions." Rather, the regulations—and, indeed, common sense—make clear that the use of Form C–4 as an adverse action notice would be appropriate if, and only if, the action taken by the creditor—i.e., the denial of credit and the counteroffer—qualifies as an "adverse action," as defined in the regulations. In fact, the Board has explained that "Forms C–1 through C–4 are intended for use in notifying an applicant that *adverse action* has been taken on an application or account under § 202.9(a)(1) and (2)(i) of this regulation." Equal Credit Opportunity Business Credit, 12 C.F.R. Pt. 202. The dispositive inquiry, therefore, is whether a particular denial of credit—counteroffer combination constitutes an "adverse action" on an application. In this regard, it is important to recall that the regulations limit the circumstances in which a denial of credit coupled with counteroffer qualifies as an "adverse action." These circumstances do not include situations where a creditor "makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered." *Id.* § 202.2(c) (emphasis added). Thus, plaintiffs' reliance on Form C–4 is unpersuasive.[8]

Plaintiffs, in their second argument, point to two ECOA provisions and

---

8. Also unpersuasive is plaintiffs' reference to a staff interpretation that provides:

*Counteroffer combined with adverse action notice.* A creditor that gives the applicant a combined counteroffer and adverse action notice that complies with § 202.9(a)(2) need not send a second adverse action notice if the applicant does not accept the counteroffer. A sample of a combined notice is contained in form C–4 of Appendix C to the regulation.

12 C.F.R. Pt. 202, Supp. 1, Section 202.9—Notifications, Paragraph 9(a)(1), point number 6. The interpretation's reference to a "sec-

ond adverse action notice" may, at first blush, suggest that there must be a preliminary "combined counteroffer and adverse action notice" to obviate the need for the second notice "if the applicant does not accept the counteroffer." Yet, a close reading of this interpretation reveals that it is limited to describing the duties of a creditor when the applicant rejects a counteroffer—exempting a creditor from providing an adverse action notice *if* it already had done so—and does not otherwise require the initial provision of an adverse action notice before a rejection.

three regulations allowing a creditor to communicate orally with an applicant as necessarily implying that written notice is required in other circumstances involving denials of credit.[9] This argument, too, must fail. These ECOA provisions and regulations constitute mere exceptions to the general rule that *adverse actions* require written notice and, therefore, do not address ECOA's notice requirements when the action taken by a creditor is not "adverse."[10] Moreover, plaintiffs' repeated characterization of these ECOA provisions and regulations as standing for the proposition that "denials of credit" generally require written notice does not change this conclusion, for plaintiffs' focus on "denials of credit" misses the mark. The relevant inquiry is not whether the action taken by a creditor was a denial of credit; rather, the necessary determination for purposes of ECOA's written–notice requirement is whether the action taken is an "adverse action." This distinction matters, for a denial of credit is not always an "adverse action" under ECOA and the regulations; accordingly, not every denial of credit requires written notification. In this regard, the regulations carve out an exception to the definition of "adverse action" for a denial of credit coupled with a counteroffer that the applicant accepts. The existence of other exceptions to the adverse-action notice requirement is, therefore, consistent with the exception for a denial of credit coupled with a counteroffer accepted by the applicant.[11]

■■■ Plaintiffs'. third argument is a challenge to the Board's authority to interpret "adverse action" for ECOA's purposes as excluding a denial of credit coupled with a counteroffer that is ultimately accepted by the applicant.[12] For, in the end, it is

9. The two ECOA provisions state that a creditor acting on fewer than one hundred and fifty applications during a calendar year preceding a denial of credit may provide oral notice of the denial, and that a creditor may orally communicate the "identity of the person or office" from which the applicant can obtain a written statement if certain conditions are met. *See* 15 U.S.C. §§ 1691(5), (d)(2)(B). The first regulation provides that, for business credit applications for businesses with gross revenues of one million dollars or less, "[t]he statement of the action taken maybe given orally or in writing, when adverse action is taken." 12 C.F.R. § 202.9(a)(3)(A). The second allows oral notification of a denial of credit where the applicant is a business with gross revenues of over one million dollars. *See id.* § 202.9(a)(3)(ii)(A). Finally, plaintiffs point to a regulation allowing, "[a]t its option, a creditor [to] inform the applicant orally of the need for additional information," but providing that, "if the application remains incomplete the creditor shall send a notice in accordance with paragraph (c)(1) of this section." *Id.* § 202.9(c)(3).

10. Indeed, Regulation 202.9(c)(3), which allows a creditor to inform an applicant orally of the need for more information, does not even relate to any of the three actions a creditor may take on an application—namely, approval, denial, or counteroffer. *See* 12 C.F.R. § 202.9(c)(3).

11. Indeed, plaintiffs' argument proves too much, as neither ECOA nor any regulation expressly provides for oral notice of credit approvals, and such oral notice would also not be allowed under the rationale of plaintiffs' argument. Yet, plaintiffs themselves acknowledge that "notice of credit approval can be implicit by the granting of the requested credit." Plaintiffs' Memorandum in Opposition to National City Mortgage Company's Motion for Judgment on the Pleadings, at 5. An explicit exception for this universally acknowledged practice is not required because only an "adverse action" requires the provision of written notice under ECOA and the regulations.

12. VA ECOA charges the Virginia State Corporation Commission with "adopt[ing] regulations to effectuate the purposes of this chapter provided that such regulations conform to and are no broader in scope than regulations, and amendments thereto, adopted by the Board of Governors of the Federal Reserve System under the Consumer Credit Protection Act, Title VII." Va.Code § 59.1–21.24. The Commission, in turn, has "incorporated by reference and adopted for use in the Commonwealth of Virginia," Regulation B of the Board. 10 Va.Adm.Code 5–180–10. Thus, the discussion here concerning whether the Board's definition of "adverse action" exceeds the Board's statutory authority applies with equal force to whether the Commission's adoption of the Board's "adverse action" reg-

clear that this interpretation applies to this case, and that NCR's duty to inform plaintiffs of its action in writing ultimately depends on whether this regulation is a legitimate exercise of the Board's regulatory authority under ECOA. In this regard, settled law teaches that "considerable weight should be accorded to [the Board's] construction of a statutory scheme it is entrusted to administer,"[13] and that "courts must give [the Board's] decision controlling weight unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'"[14]

ECOA contemplates—indeed, requires—the active involvement of the Board in the interpretation of its provisions and in the administration of its consumer protections. To that end, ECOA grants the Board broad authority to "provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes" of the Act. 15 U.S.C. § 1691b(a)(1); *cf. Ford Credit Co. v. Milhollin*, 444 U.S. 555, 559–60, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980) (noting, in a Truth in Lending Act case, that "Congress ... delegated expansive authority to the Federal Reserve Board to elaborate and expand the legal framework governing commerce in credit"). Accordingly, deference and respect must be paid to ECOA's mandate and the lawmaking authority and expertise of the Board, "so long as [the Board's] lawmaking is not irrational" and is consistent with the congressional purpose. *Milhollin*, 444 U.S. at 568, 100 S.Ct. 790; *see Dorsey*, 678 F.2d at 139; *Besaw v. General Fin. Corp.*, 693 F.2d 1032, 1034 (11th Cir.1982). In this case, as in *Dorsey*, there is "no persuasive reason to find that the relevant portion of Regulation B is anything but a rational exercise of the Board's rulemaking authority," and "Section 202.2 obviously represents a well considered and reasonable interpretation of the notification requirements" of ECOA. *Dorsey*, 678 F.2d at 139. It is reasonable for the Board to determine, for example, that an applicant eliminates any adversity stemming from the original loan application denial by accepting a creditor's counteroffer for a different loan. This is so because an applicant's acceptance of a counteroffer may reasonably be taken to represent the applicant's agreement with the creditor's independent assessment of the applicant's credit profile. As one commentator put it, it would be "pointless to designate the lender's action as adverse ... when the lender and the applicant ha[ve] agreed on a new arrangement."[15] More importantly, the Board's determination in this regard is consistent with ECOA's goal of preventing discrimination in consumer credit transactions, for an applicant, by simply rejecting a creditor's counteroffer, can express her disagreement with the creditor's assessment and thereby require the creditor to provide a full explanation for an initial denial of credit. A creditor, facing the very real possibility that a rejected applicant would exercise this right to a written notice, has every incentive to ensure not only that its initial denial of credit is nondiscriminatory, but also that its counteroffer is an accurate assessment of the applicant's credit profile.

Thus, the Board's Regulation B, which exempts from the definition of "adverse action" under ECOA a creditor's denial of a credit application that is coupled with a counteroffer that the applicant accepts, is a reasonable and valid exercise of the

---

ulation is a valid exercise of its power under VA ECOA.

**13.** *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**14.** *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 325, 114 S.Ct. 835, 127 L.Ed.2d 152

(1994) (quoting *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778).

**15.** Elwin Griffith, *The Quest for Fair Credit Reporting and Equal Credit Opportunity in Consumer Transactions*, 25 U.Mem.L.Rev. 37, 115 (1994).

Board's authority and applies to this case. In this regard, plaintiffs have failed to show that the Board exceeded its authority under ECOA in promulgating the regulation, thereby "thwart[ing] the statutory mandate it was designed to implement." *Jochum,* 730 F.2d at 1047. Accordingly, NCM was not required to provide written notice of its denial of plaintiffs' "FHA Plus" loan application. It follows, therefore, that NCM's motion for summary judgment on plaintiffs' claims for unlawful failure to provide notice of adverse action under ECOA and VA ECOA must be granted.

## IV.

For the foregoing reasons, defendant NCM's motion for summary judgment on plaintiffs' claims for unlawful failure to provide notice of adverse action under ECOA and VA ECOA (Counts III, IV, VII, and VIII) is **GRANTED.** In addition, NCM's motion for summary judgment on plaintiffs' unlawful denial of credit claims (Counts I, II, V, and VI) is **GRANTED.**

An appropriate Order shall issue.